727 A.2d 448

**An DIEP et al.**

v.

**Hector RIVAS et al.**

**No. 1093, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 12, 1999.

134

Patrick James Attridge (King & Attridge, on the brief), Rockville, for Appellants.

Mark S. Carlin (Marc L. Caden and Sherman, Meehan, Curtin & Ain, P.C., on the brief), Washington, DC, for Appellee, Rivas.

Charles E. Wilson, Jr. (Amy Leete Leone and McCarthy, Wilson & Ethridge, on the brief), Rockville, for Appellee, CNA Ins. Co.

Argued before MURPHY, C.J., and ADKINS and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

JAMES S. GETTY, Judge (Ret'd, Specially Assigned).

Who, if anyone, is entitled to the proceeds of a group life insurance policy stemming from the death of Maria Rivas? The question is easily understood; the answer is more complicated, due to the bizarre circumstances giving rise to the competing claims.

### Background

Xuang Ky Tran was employed by IIT Research Institute at the time of his death on April 2, 1996. As a full-time employee, Tran obtained an accidental death and dismemberment policy issued by Continental Casualty Company (CNA) to the holder, IIT. Tran opted for a plan that provided life insurance for a spouse of a full-time employee. Tran and Maria Rivas were married on September 6, 1990; they had no children.

The amount payable upon Tran's death was $300,000, the amount payable on the death of his wife was $150,000. On April 2, 1996, an argument erupted between Tran and his wife. She called 911 for assistance and during the conversation Tran killed her and immediately thereafter committed suicide by shooting himself with the same gun he used to murder his wife.

The claimants are An and Vanessa Diep, who are the brother and sister of Tran,[1] and Dr. and Mrs. Hector Rivas, the parents of Maria Rivas. CNA filed a Complaint of Interpleader and paid the proceeds of $150,000 covering Maria Rivas into the Registry of the Court.

The Dieps and Dr. Rivas filed cross motions for summary judgment. The case was heard in the Circuit Court for Montgomery County on April 27, 1998. The court held that the policy was unambiguous and that the $150,000 was to be paid to Dr. Rivas. Additionally, the court ordered that inter-

---

1. The Dieps claimed the proceeds, as secondary beneficiaries of the coverage provided to both Tran and Maria Rivas, although they did not litigate the $300,000 claim, probably because of the suicide exclusion.

est on the award was to be calculated from the date of the court order directing CNA to deposit the money with the court until the date of the judgment, April 27, 1998.[2] The Dieps have appealed from those decisions.

## *Discussion*

Briefly, the general rule of construction of insurance policies in Maryland is to apply the terms of the contract in deciding the scope and limitations of the coverage. *Chantel Associates v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995). The objective is to ascertain the intent of the parties to the agreement by viewing the policy as a whole, rather than by emphasizing one provision to the exclusion of another. Each provision or clause, whenever possible, shall be given effect by construing the language in its usually accepted meaning. *Empire Fire and Marine Company v. Liberty Mut. Ins. Co.*, 117 Md.App. 72, 95–96, 699 A.2d 482 (1997). The nature of the policy and the purpose it was intended to serve are important considerations in determining intent. *Id.* at 96, 699 A.2d 482.

The Dieps claim they are entitled to the proceeds of the policy under the "Payment of Claim" section, which provides for payment to the employee's designated beneficiary or relatives as set forth in the policy. They also contend that they are not disqualified by the Slayer's Rule.[3]

Dr. Rivas claims the proceeds on the theory that Maria Rivas, his daughter, was the "insured" for the purpose of the policy on her life. He contends that several persons may be

---

**2.** The policy did not provide for the payment of interest. Under such circumstances, the award of prejudgment interest is within the discretion of the trier of fact. *See Crystal v. West and Callahan, Inc.*, 328 Md. 318, 343, 614 A.2d 560 (1992).

**3.** As a matter of public policy, the Slayer's Rule precludes a perpetrator from sharing in the victim's estate. *See Price v. Hitaffer*, 164 Md. 505, 165 A. 470 (1933). The trial judge, in dicta, indicated that the rule did not apply in this case. We shall address the application of the rule later herein.

insured under the terms of the policy and each may have separate interests.

### *The Policy*

Initially, the policy states the effective date and term, which is one year. CNA reserves the right to non-renew after the first insurance year on any premium due date. Other relevant policy provisions are as follows:

### DEFINITIONS

"We," "Our" and "Us" mean the Continental Casualty Company, Chicago, Illinois.

"Insured" means the eligible person whose insurance is in force under the terms of this policy.

"Insured person" means the insured and the insured family members of the insured.

"Principal Sum" means the amount of insurance, as shown in Statement 3 of the Application, which applies to the Insured Person.

### ELIGIBLE PERSONS

All persons described in Statement 2 of the application are eligible for insurance under this policy.

### Eligible Family Members

The eligible persons becoming insured under this policy may also insure their eligible family members. Eligible family members, if any, are described in Statement 2 of the application. A person may not be insured under this policy as both an eligible person and an eligible family member. An eligible dependent child may not be insured as a dependent child of more than one insured.

### Exclusions

This policy does not cover any loss caused or resulting from:
* * *

4. Suicide or a suicide attempt while sane or self-destruction or an attempt to self-destroy while insane;....

## Individual Terminations

The insurance of any insured will cease on the earliest of the following dates:

1. On the date this policy is terminated;

2. At the end of the Grace Period if the Holder fails to pay the required premium;

3. On the premium due date that falls on or next follows:

   a. The date the Insured ceases to be associated with the Holder in a capacity that makes him eligible for this insurance; or

   b. The date the insured attains the age at which he is no longer an eligible person as stated in Statement 2 of the Application.

The insurance of any insured family member will cease on the earliest of the following dates:

1. On the date insurance for the Insured terminates; or

2. On the premium due date that falls on or next follows the date such person ceases to be an eligible family member as described in Statement 2 of the Application.

## CERTIFICATES

We will deliver certificates to the Holder for issuance to each insured. The certificates will describe the benefits and to whom payable, the limits of this policy and where it may be inspected.

## UNIFORM PROVISIONS

**ENTIRE CONTRACT; CHANGES:** This policy, the Application and any attached papers constitute the entire contract between the parties.

* * *

**WRITTEN PROOF OF LOSS:** Written proof of loss must be given to Us within 90 days after the date of such loss....

Unless the Insured Person is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

\* \* \*

**PAYMENT OF CLAIM:** Benefits for loss of life of the Insured will be paid in accordance with the beneficiary designation in effect at the time of payment. If no such designation is in effect at that time, the benefits shall be paid to the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the Insured:

The insured's (a) spouse; (b) children, including legally adopted children; (c) parents; (d) brothers and sister[s]; or (e) estate. . . .

\* \* \*

Benefits for loss of life of any insured family members will [be] payable to the Insured, if living, otherwise in the same manner as above.

Benefits for other than loss of life are payable to the Insured. All accrued benefits unpaid at the death of the Insured will be payable in the same manner as above.

### Analysis

The trial court, at the conclusion of argument by counsel, rendered the following decision:

The issue before the court is contract interpretation. There are definitions within the policy. For example, the definition[s] say "insured" means eligible person. Under "eligible person" the family members are included.

The policy states under the caption of eligible persons, all persons described in Statement 2 [4] are eligible for insurance under this policy. Included in Statement 2 are an insured employee, an insured spouse, an[d] insured dependent children.

---

4. Statement 2 is set forth in Addendum 1 of the application for insurance.

A claim form supplied by the insurance company asked for the name of the insured in full. It identifies Maria Reavis [sic]. Defendants filled in Ms. Reavis' [sic] name above the heading, name of the Insured when they submitted their claim to CNA insurance.

Benefits cannot be triggered unless the insured person, be it an employee, the spouse, or the dependent child[,] is injured or killed. Ms. Reavis [sic] was insured for her life. Benefits were triggered on her death.

A common sense reading of the policy dictates this result. Therefore, summary judgment is granted in favor of Dr. Reavis [sic] and summary judgment for the cross defendant is denied.

Contrary to the court's assertion that the definitions say "insured means eligible person," the definition says "Insured means the eligible person whose insurance is in force under the terms of this policy." That reference is to the employee whose status as a full-time employee triggers the issuance of the policy. Family members are identified in the policy under the definition of "Insured Person," which provides that "Insured Person means the insured and the insured family members of the insured." Of course, both the insured and his designated family members are eligible for insurance under the policy. In short, the policy distinguishes between who is the insured and who are the persons receiving insurance coverage.

The trial court referred to Maria Rivas as being "insured for her life." We construe that statement to mean that she had insurance *on* her life. She was not necessarily insured for her entire life had the murder not occurred, because eligibility of a spouse, as set forth in Addendum 1 of the Application, is from "age 18 through 70."

In dicta, the court indicated that the Slayer's Rule did not appear to be applicable in this case, but that issue was not decided in light of the court's granting Dr. Rivas's motion for summary judgment. We shall, therefore, address first the Dieps claim.

## 1. The Dieps Claim

The Dieps argue that they are entitled to the proceeds of the policy on the life of Maria Rivas because all of the benefits under the policy are payable to the employee, if living, and to the employee's designated beneficiary or relatives when the employee is deceased. They allege that they are innocent of any involvement in the death of their sister-in-law; that they are not claiming on behalf of the estate of their brother; that their claim is based solely on the express terms of the policy; and that Maria Rivas had no right to designate a beneficiary, because the policy expressly provided that the proceeds of the policy were payable to Tran, the insured.

The hill the Dieps must climb is the Slayer's Rule. We hold, for the following reasons, that the Dieps as a matter of law are ineligible to receive the proceeds of insurance on the life of Maria Rivas. The Maryland Legislature has not enacted a "Slayer's" statute governing whether a murderer may be enriched by taking any portion of the estate of the victim. We have, however, judicially adopted the Slayer's Rule, which is founded upon principles of equity, justice, morality, and on the ground of public policy. The first Maryland case to address the issue was *Price v. Hitaffer*, 164 Md. 505, 165 A. 470 (1933). The Court held that the heirs and personal representatives of the husband who killed his wife and immediately thereafter committed suicide were excluded from participation in the distribution of the estate of the wife. The Court also indicated that the same principles should be applied where a beneficiary of a life insurance policy murdered the insured.

The maxim that one cannot profit from his own wrong was followed in *Chase v. Jenifer*, 219 Md. 564, 150 A.2d 251 (1959), holding that a beneficiary acquitted of murder but convicted of manslaughter was barred by the Slayer's Rule from receiving benefits payable from the victim's life insurance policy. Where the killing is unintentional, such as accidental, or grossly negligent amounting to involuntary manslaughter, the beneficiary's rights under the policy are not

barred. *Schifanelli v. Wallace*, 271 Md. 177, 188–89, 315 A.2d 513 (1974).

The Dieps contend that their claim is not based upon being an heir or representative of Tran's estate, that they are claiming under the terms of the policy. They also interpret the case law as prohibiting only the person responsible for the intentional killing from profiting by his felonious action. We disagree with the assertion that only the killer is precluded from sharing property generated by his own crime.

In *Ford v. Ford*, 307 Md. 105, 109, 512 A.2d 389 (1986), the Court of Appeals cited with approval the holding in *Price* (which adopted the Slayer's Rule) that "a murderer, or his heirs or representatives through him, ordinarily may not profit by taking any portion of the estate of one murdered." The equitable maxims of the common law which the Court followed in *Price* "apply not only in the case of intestacy, but equally to benefits by way of wills and life insurance policies." *Id.* at 109, 512 A.2d 389.

The Court made abundantly clear in *Ford* that

As established by *Price, Chase* and *Schifanelli,* the present status of the law of Maryland is:

1) A person who kills another

a) *may not* share in the distribution of the decedent's estate as an heir by way of statutes of descent and distribution, or as a devisee or legatee under the decedent's will, nor may one collect the proceeds as a beneficiary under a policy of insurance on the decedent's life when the homicide is felonious and intentional;

b) *may* share in the distribution of the decedent's estate as an heir by way of statutes of descent and distribution, or as a devisee or legatee under the decedent's will and *may* collect the proceeds as a beneficiary under a policy of insurance on the decedent's life when the homicide is unintentional even though it is the

result of such gross negligence as would render the killer criminally guilty of involuntary manslaughter.

2) These principles apply not only to the killer but to those claiming through or under him.

*Id.* at 111–12, 512 A.2d 389. *Accord: Sherman v. Robinson,* 319 Md. 445, 573 A.2d 34 (1990); *Johnson v. Hebb,* 729 F.Supp. 1524 (D.Md.1990); *Sherman v. Sherman,* 804 F.Supp. 729 (D.Md.1992).

■ Based upon the case law discussed herein, we hold that the secondary beneficiaries are precluded from receiving the proceeds of the insurance on the life of the victim, Maria Rivas. By reason of his intentional murder of his wife, which is not disputed, Tran never acquired any interest in the proceeds of the coverage purchased by Tran for his wife. He is precluded by the Slayer's Rule from receiving the proceeds payable upon her death. Tran never having acquired any right to the proceeds, the secondary beneficiaries have no interest to assert because their claim is through Tran as surviving brother and sister.

The holding in *Ford* states expressly that the Slayer's Rule is applicable to those claiming "through or under" the slayer. Tran's brother and sister are without question claiming through and under Tran, who was the insured as defined in the policy. The Dieps also state, and we agree, that they are not guilty of any wrongdoing. That fact, however, has no bearing on eligibility. If the law provided that innocent secondary beneficiaries were not excluded by the Slayer's Rule, the public policy reason for the rule would be eroded significantly and, arguably, the murder/suicide statistics would increase dramatically. Thus, although the trial court did not rely on the Slayer's Rule in denying the Dieps motion for summary judgment, as the court would have had no discretion in the application of that rule to the undisputed material facts of the instant case, we can affirm the denial of the motion on the ground of the application of the Slayer's Rule.

## 2. The Rivas Claim

Dr. Rivas argues that, for the purpose of claiming the proceeds of the coverage for his daughter, she was an insured as defined in the policy. According to Dr. Rivas, Maria was an insured "because the policy defines 'Insured' to include 'Eligible Person,' and Maria was an 'Eligible Person' under Statement 2, Addendum I."

We disagree with Dr. Rivas's interpretation of the policy definitions. The Definition of "insured" under the policy, as we stated earlier, uses the words "eligible person" to define the individual owner of the policy, *i.e.*, the employee. The policy states, " 'Insured' means the eligible person whose insurance is in force under the terms of this policy." Eligibility for a policy is dependent on being a full-time employee of the holder. Maria Rivas was not the insured, she was an "insured person" by reason of the fact that her husband, Tran, elected to provide coverage for her as a spouse. An insured person is separately defined as "Insured person means the insured and the insured family members of the insured."

Maria Rivas had no control whatever over this policy. This was a single policy issued to Tran. Only he could select the beneficiary of the principal sum, and only he could decide whether to include his wife as an insured person. By the express terms of the policy, only he was the named beneficiary on the life of Maria Rivas. She could not designate a beneficiary.

█ Notwithstanding that Maria Rivas was not the insured as defined in the policy, she was an insured person, or insured family member, and benefits were payable upon her accidental death. In order to effect the intent of the parties, the policy is viewed as a whole, without emphasis on any particular provision. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995). In *St. Paul Fire & Marine Ins. v. Molloy*, 291 Md. 139, 153, 433 A.2d 1135 (1981), the Court of Appeals cited with approval the following language set forth in *Howell v. Ohio Casualty Ins. Co.*, 130 N.J.Super. 350, 327 A.2d 240, 243 (App.Div.1974):

There is much to commend the view that, unless the terms of an insurance policy are plainly to the contrary ... the obligation of the carrier should be considered several as to each person injured, and the fraud or misconduct of one insured should not bar recovery by the innocent co-insureds to the extent of their respective interests in the property involved.

In *Howell,* the term "insured" was defined in a homeowner's policy as the "named Insured" and the named insured's spouse if a resident of the named insured's household. The named insured set fire to the house and committed suicide while it was burning. The Court held that the contract rights of the innocent spouse were several, not joint, and thus not subject to forfeiture by the unilateral acts of the husband.

We conclude that similar reasoning should be applied herein. Maria Rivas was clearly an insured person under the terms of the policy. Benefits were triggered upon her death as a result of her husband's felonious act. Because her husband and those claiming through him are precluded from receiving the death benefit, payment to the members of the class set forth in the policy are payable to Dr. Rivas. Under the Payment of Claim provision of the policy, payments on the life of the insured are payable to the named beneficiary. If no such designation is in effect, the benefits are payable to the insured's successive preference beneficiaries, which in this case are the Dieps, who are also disqualified as a matter of public policy.

The payment provisions for loss of life of an insured family member, on the other hand, are payable to the insured, if living, "otherwise in the same manner as above." A reasonable interpretation of the phrase "in the same manner as above" means to follow the schedule of successive beneficiaries of the deceased family member. It does not mean to select the next in line of the insured's family. If that had been the intention, the policy would have said so. We conclude that the same procedure applies no matter whether the insured or the insured family member dies, but the benefits are payable to

the preference beneficiaries of the person whose death has triggered a claim. By parity of reasoning, we are able to affirm the grant of summary judgment on this basis, not relied upon by the trial judge because she would have had no discretion to deny it on this ground as a matter of law.

Finally, Dr. Rivas did not appeal the prejudgment interest issue. The policy did not provide for prejudgment interest. The court awarded interest from the date of the order directing CNA to deposit the $150,000 in the Court Registry until the date of judgment, April 27, 1998. We perceive no abuse of discretion.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**